**In the United States District Court
for the District of Kansas**

―――――――――

Case No. 22-cv-02250-TC

―――――――――

UNITED STATES OF AMERICA,

*Plaintiff*

v.

STATE OF KANSAS
(DEPARTMENT OF HEALTH & ENVIRONMENT),

*Defendant*

―――――――――

**MEMORANDUM AND ORDER**

The United States sued the State of Kansas, alleging the Kansas Department of Health and Environment violated the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* (USERRA). The parties each filed motions for summary judgment. Docs. 47 and 49. For the following reasons, the United States' motion is denied and Kansas's is granted.

**I**

**A**

Summary judgment is proper when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to a claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Id.* Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

1

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, a court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1138 (10th Cir. 2011). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137–38 (10th Cir. 2016); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

The filing of cross-motions for summary judgment does not alter this standard. Each motion—and its material facts—must "be treated separately," meaning that "the denial of one does not require the grant of another." *Atl. Richfield Co. v. Farm Credit Bank Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). For each motion, the moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex*, 477 U.S. at 323; *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the non-moving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita*, 475 U.S. at 586–87; *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

**B**

The legal question can be simply stated: whether the State of Kansas, in addition to Finney County, is an "employer" as that term is used in 38 U.S.C. § 4301 *et seq.* The answer to that question is made difficult by the involved factual chain connecting these parties. There are at least four relationships between and among the United States, the State

of Kansas's Department of Health & Environment, the Finney County Health Department, and servicemember Stacy Gonzales.[1]

Beginning at a high level of generality, the federal government gave a grant to Kansas for specified work, Kansas discharged its obligations by, among other things, selecting the Finney County Health Department as one of its sub-granteees to complete the specified work in Garden City and the surrounding area. Finney County hired Gonzales to help it satisfy the sub-grant.

The origin of this dispute concerns Kansas's decision not to renew Finney County's sub-grant in 2010. Without Kansas's grant, Finney County neither had work to perform under the sub-grant nor money to pay Gonzales's salary. The United States now claims that Kansas's decision not to renew Finney County's annual sub-grant violated USERRA because Kansas knew that Gonzales was preparing for deployment at or near the time that Kansas declined to renew Finney County's grant. These general facts lay the groundwork for the following, more specific facts and legal dispute between the United States and Kansas. The following provides more details of the grant to Kansas, the implementation of the sub-grant from Kansas to Finney County, and the path this litigation has taken to this point.

**1.** The United States, through the Centers for Disease Control (CDC), provides grants, called Sexually Transmitted Disease Prevention Awards, to states in exchange for their reporting, tracking, and preventing the spread of communicable diseases, like gonorrhea, chlamydia, and AIDS. *See* Doc. 42 at ¶ 2.a.viii, 11. As a condition of funding, the CDC requires recipient states to follow certain reporting and tracking protocols. *See* Doc. 42 at ¶ 2.a.viii, Doc. 53 at ¶ 7. The CDC awarded Kansas a Prevention Award. *See* Doc. 42 at ¶ 2.a.viii, 12.

Kansas discharges its Prevention Award oligations to the CDC in at least two ways. It hires staff directly and, in other circumstances relevant here, it provides annual, renewable sub-grants to county health

---

[1] The material facts in this section are drawn from the Pretrial Order, Doc. 42, the United States' memorandum in support of partial summary judgment, Doc. 47, and/or Kansas's memorandum in support of summary judgment, Doc. 49. Occasionally, the opposing party's objection, Docs. 52 or 53, or an exhibit is directly cited. Immaterial facts and the parties' disputes concerning them have generally been omitted, but some remain purely for contextualizing the litigation. *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (recognizing that disputes over facts that are irrelevant or unnecessary to resolving the claim can be ignored).

agencies to meet its CDC data collection obligations. *See* Doc. 49 at ¶¶ 5, 7, 11; Doc. 53 at ¶ 7, 9. When Kansas selects a county health agency as a sub-grantee, it requires the sub-grantee to meet the same objectives and deliverables imposed on Kansas by its CDC Prevention Award. *See id.* No state general funds are spent on the sub-grants, known as Disease Intervention ATL grants. Doc. 42 at ¶ 2.a.vii; Doc. 49 at ¶¶ 5–10. In other words, Kansas transfers federal money to the sub-grantees and then holds them accountable for their performance.

When Kansas awards one of these grants to a county, the Notice of Award outlines the requirements imposed on the county in exchange for the grant. Doc. 42 at ¶ 2.a.xxiii; Doc. 47 at ¶¶ 21, 23–24, 26–27, 29, 31–34, 47; Doc. 49 at ¶¶ 25, 29, 30-31, 34, 36-39; Doc. 53 at 7, ¶ 18. These requirements include quantitative objectives and detailed investigative protocols and procedures for obtaining and managing data about patients' sexually transmitted infections. Doc. 49 at ¶¶ 10, 29, 34. Kansas provides these protocols in its Field Services Manual, which includes protocols from Kansas and the CDC. Doc. 47 at ¶¶ 23–24, 26–27, Doc. 53 at 7, ¶ 18. Some protocols are quite detailed; for example, grantees are required to organize reports in a precise manner. Doc. 47 at ¶¶ 23–24, 26–27, 31– 34, 43; Doc. 49 at ¶¶ 29–30. Kansas also requires grantees to meet specified training requirements, such as attendance at quarterly meetings. Doc. 49 at ¶¶ 25, 29–31, 33–34.

To protect patient privacy, the person who collects the sensitive health data is required to relay this information directly to Kansas's Department of Health and Environment. Doc. 47 at ¶¶ 18, 21, 29, 62. No sub-grantee, including Finney County, can access individual reports. Doc. 47 at ¶ 34, Doc. 49 at ¶ 37. Instead, Kansas reports only aggregate statistics to its grantees on a monthly basis so each sub-grantee can monitor its own sub-grant performance. Doc. 49 at ¶¶ 52, 81.

Several Kansas staff members have administered Kansas's ATL grants over the years. Two are relevant in this litigation. Derek Coppedge was a consistent presence from 2000 through 2013, first as Manager of Field Operations/Deputy Director, and subsequently as STD Section Director. Doc. 42 at ¶¶ 2.a.iii–iv, vi, xv. Once Coppedge was promoted in June 2008, Jennifer VandeVelde succeeded him as Deputy Director. Doc. 42 at ¶ 2.a.vi.

4

**2.** From July 1998 through June 2010, Kansas awarded one-year ATL sub-grants to Finney County. Doc. 42 at ¶ 2.a.xi.–xiv. To discharge its grant obligations to Kansas, Finney County decided to hire a Disease Intervention Specialist. Kansas has no power to directly hire or fire a county-level Specialist. Doc. 49 at ¶¶ 18–21, 39, 41–43. Finney County staff interviewed Gonzales for the Specialist job; Coppedge was also present in her interview. Doc. 49 at ¶¶ 18–20, 59. When Gonzales interviewed for the Specialist role, she was already working at Finney County as a victim witness coordinator in the County Attorney's Office. Doc. 49 at ¶¶ 56, 57.

Finney County hired Gonzales and she served as Finney County's Disease Intervention Specialist from May 2001 through June 30, 2010. Doc. 42 at ¶¶ 2.a.xx. During that time, Gonzales also served in the military. Doc. 42 at ¶ 2.a.xxviii. She was periodically absent to fulfill her military obligations, including active deployments from March 11, 2003 through July 28, 2004, and May 4, 2006 through September 21, 2007. Doc. 42 at ¶ 2.a.xxviii–xxxiii. No one filled her position during these deployments. Doc. 48-12 at 15. There is no indication how or whether Finney County performed its obligations during this time.

Finney County tasked Gonzales with performing its obligations under the grant, including interviewing patients in Finney County and beyond. Doc. 47 at ¶ 18, 21, 29, 58, 62. Finney County did not add any requirements to Gonzales's Specialist duties beyond those necessary to meet its sub-grant obligations. Doc. 47 at ¶ 75. Gonzales understood her job depended on Finney County obtaining grant funding from Kansas but was not familiar with the grant's specific objectives, nor was she involved in the grant renewal process. Doc. 49 at ¶¶ 60, 62–63.

Finney County set Gonzales's salary and benefits using its own pay scales. Doc. 49 at ¶ 47. And it paid Gonzales directly. Doc. 49 at ¶¶ 47, 64–65. Finney County relied on the funds from Kansas's grant to pay for much—but not all—of Gonzales's salary. Doc. 49 at ¶¶ 14–15, 46, 107. Kansas never issued any payment to Gonzales. Doc. 49 at ¶ 66.

The Finney County Health Department Director supervised Gonzales. The Director prepared her position description, hired her, provided annual performance evaluations, approved her leave, handled disciplinary action, and addressed complaints. Doc. 49 at ¶¶ 49, 58–67, 69–73, 77, 81. At the time Kansas chose not to renew Finney County's grant, Ashley Goss was the Director and Gonzales's direct supervisor.

Doc. 49 at ¶ 58, 69, 70, 72. Goss interacted with Gonzales regularly (usually twice a week), but she did not travel with Gonzales when Gonzales conducted interviews required by the County's grant. Doc. 49 at ¶¶ 75, 79; Doc. 53 at 3, ¶ 14.

Gonzales had sporadic—certainly quarterly, perhaps more frequent—contact with Kansas's grant administrators. Doc. 49 at ¶¶ 29–31; Doc. 48-12 at 11. One administrator, Coppedge, conducted field audits of Gonzales's patient interviews while he was Kansas's Deputy Director, but his successor, VandeVelde, did not. Doc. 48-12 at 11. VandeVelde, did, however, have other contact with Gonzales. For example, she provided Gonzales with feedback about the quality and quantity of Gonzales's interview reports. *See* Doc. 48-12 at 10–11.

Gonzales chafed under VandeVelde's supervision. She felt that VandeVelde "harassed" her about "dotting I's and crossing T's," told her she was "not doing enough interviews," and complained about Gonzales's military service. Doc. 48-12 at 8, 10–11. Specifically, Gonzales alleged that VandeVelde made three anti-military comments that are the impetus of this suit. First, Gonzales says, at some point between 2008 and 2010, VandeVelde urged her to follow-up on a service-related injury in a manner that "mock[ed] [her] regarding [her] military service." Doc. 56 at ¶¶ 17–19. Then, Gonzales alleges, VandeVelde twice told her in early 2010 to choose between "[her] military service and [her] career." *Id.*[2]

---

[2] Kansas suggests these statements should be discredited as part of a sham affidavit. Doc. 58 at 10–12. But sham affidavit analysis requires first proving that a statement contradicts sworn testimony. *See L. Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169–70 (10th Cir. 2009). Unlike other statements from Gonzales's affidavit, Kansas does not allege that these statements contradict Gonzales's prior testimony. *See* Doc. 58 at 10–12. Nor could it, since Gonzales previously testified that she believed VandeVelde was "harassing" her. Doc. 48-12 at 8, 10–11. The statements in the affidavit provide specific instances to further explain how Gonzales believed she was being harassed and therefore are not subject to sham affidavit analysis. *See Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, n.3 (10th Cir. 2012) (explaining that additional discriminatory statements did not contradict the affiant's deposition, where she testified that such statements were "many"). Accordingly, the United States' motion for a surreply to address Kansas's sham affidavit argument, Doc. 59, is denied.

Finney County provided Gonzales with annual performance evaluations and personnel correction plans. Doc. 49 at ¶ 67, 70; Doc. 48-5. Specifically, when nurses complained about Gonzales's conduct, Goss addressed their concerns with her. Doc. 49 at ¶ 77 (referencing Goss's testimony that nurses reported that Gonzales had been making inappropriate sexual comments). Goss also relied on Kansas's aggregated monthly reports regarding the County's processed interviews and data collection as a factor in Gonzales's performance evaluations. Doc. 49 at ¶ 81. There are two unsigned performance reviews of Gonzales from 2008 and 2009 that were memorialized on a form that was created by Kansas. Docs. 47-7, 47-8. Gonzales testified she had not seen these forms before her deposition. Doc. 48-12 at 9, 10. The record does not identify who wrote these reviews or for what purpose.

**3.** On April 1, 2010, Kansas notified Finney County in a meeting and follow-up letter that it was failing to meet grant requirements.[3] Doc. 48-6; Doc. 49 at ¶¶ 86–87. Kansas stated that Gonzales submitted only nine reports per week and conducted fewer than one interview per week for the first three months of 2010. *Id.* Kansas offered to support Goss in remediating Finney County's grant deficiencies. Doc. 48-6; Doc. 48-13 at 18. Goss does not recall if Kansas provided additional training or support after the April 1 meeting. Doc. 48-13 at 18.

Three weeks later, Kansas followed up with Goss. It noted that only 11 of the 107 positive infection cases assigned to Finney County had been interviewed. Doc. 49 at ¶ 91; Doc. 48-8. It also informed Goss that Finney County's grant would not be renewed if performance did not "dramatically improve to the levels required by the enclosed contract." Doc. 48-8.

Kansas was determining whether to renew Finney County's grant for another year while documenting these performance deficiencies. *See* Doc. 42 at ¶ 2.a.xix. One factor Kansas considered was whether the grant money was being spent judiciously, or whether another use would better achieve the grant objectives. Doc. 53-2 at 30. Given

---

[3] Although the grant is not part of the summary judgment record, it evidently listed 22 specific quantitative objectives for interviews, investigations, surveillance, and data management depending on the type of sexually transmitted infection. Doc. 47-6. For example, the grant expected Finney County to conduct an intervention interview for 80 percent of all syphilis cases within 7 days of initiation to the field. *Id.* at 2.

Finney County's documented performance problems, this factor was a key component of Kansas's discussion regarding Finney County's 2010 renewal application. *Id.* at 33–37. An administrator testified that Kansas had to make sure it did not have "money just sitting there going nowhere." *Id.*

On April 9, 2010, Gonzales received orders for a 400-day deployment beginning on October 20, 2010. Doc. 42 at ¶ 2.a.xxxii; Doc. 49 at ¶ 90. Kansas became aware of her deployment around that same time. Doc. 53 at 15, ¶¶ 61–62.

On or about June 13, 2010, Kansas notified Finney County that it would not renew the County's grant. *See* Doc. 49 at ¶¶ 103–04. Goss thereafter notified Gonzales that, as a result, her employment with Finney County would end on June 30, 2010. Doc. 42 at ¶ 2.a.xx; Doc. 47 at ¶ 78.

On November 28, 2018, Gonzales filed a complaint against Kansas and Finney County with the U.S. Department of Labor's Veterans' Employment and Training Service alleging that her termination violated USERRA. Doc. 47 at ¶¶ 85–86. In July 2019, the Department made a finding substantiating her claim against Kansas and referred Gonzales's complaint to the United States' Attorney General. Doc. 47 at ¶¶ 90–91.[4]

The United States filed this suit against Kansas on June 27, 2022.[5] Doc. 47 at ¶ 92; *see also Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 594-95 (2022) (holding that USERRA claim against state was not precluded by sovereign immunity). Both parties have now filed cross

---

[4] The record does not indicate what, if any, resolution occurred regarding the charge that Finney County violated USERRA.

[5] USERRA has no statute of limitations. 38 U.S.C. § 4327(b). Nonetheless, Kansas asserts that the claim is barred by the doctrine of laches and, in any event, that its decision not to renew the grant to Finney County did not violate USERRA. Doc. 49 at 23–28. Given the resolution of the statutory question in Part II, there is no need to decide whether Kansas preserved the equitable defense of laches, *see* Doc. 42 at n.1., and, if it did, whether it is available when asserted against the United States, *Ute Indian Tribe of the Uintah v. Myton*, 835 F.3d 1255, 1263 (10th Cir. 2016), or whetherKansas's decision not to renew the grant violated USERRA.

motions for summary judgment on whether Kansas was Gonzales's "employer" under USERRA. Doc. 47; Doc. 49.

## II

While a close call, the facts here demonstrate that Kansas was not Gonzales's "employer" under USERRA. As a result, it cannot be held liable for the alleged discrimination. Accordingly, Kansas's motion for summary judgment is granted and the United States' is denied.

### A

Congress has broad and sweeping powers to raise and support armies through variety of means. *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 585 (2022). One of the ways it has done so is to promote ways for citizens to serve in the military without sacrificing their civilian employment opportunities. *Id.* In 1994, Congress passed the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et seq.*, (USERRA), to "prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a)(3). USERRA guarantees active servicemembers certain rights, including protection from termination because of their military status and protection in reemployment following service. 38 U.S.C. §§ 4311–12, 4316.

As noted, the parties' legal dispute is focused. There is no argument that a state cannot be sued under USERRA following *Torres*. Nor is there any doubt that USERRA contemplates that a servicemember may have more than one "employer." *See generally White v. United Airlines, Inc.*, 987 F.3d 616, 627 (7th Cir. 2021). Instead, the parties dispute only whether Kansas was Gonzales's "employer" as that term is used in USERRA. Doc. 47 at 18–27; Doc. 49 at 14–21.

To determine whether Kansas was Gonzales's "employer," "[w]e begin with the text[.]" *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402 (2021). USERRA defines "employer" as "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities, including ... a person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities." 38 U.S.C. § 4303(4)(A)(i). This language confirms that more than one entity may be an "employer" of an employee in a single job. *See White*, 987 F.3d at 626–27 (explaining that "delegate" suggests that

USERRA's definition of "employer" encompasses "direct employers and indirect employers, including parent corporations"); *see also* 20 C.F.R. § 1002.37 (stating that a servicemember in a single job may have more than one employer).

An entity may be an employer if it "has control over employment opportunities." 38 U.S.C. § 4303(4)(A)(i); *see also White*, 987 F.3d at 626–27 (concluding USERRA's text suggests coverage for both direct and indirect employers). But what "control" means, USERRA does not say. Still, the plain meaning of the text at the time it was passed is instructive. *See Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) (construing the Court Interpreters Act). The prevailing definition of "control" at the time USERRA was enacted was the "power or authority to guide or manage." Merriam-Webster Dictionary (10th ed. 1993). And "over," as a preposition, was and is "used as a function word to indicate the possession or enjoyment of authority, power, or jurisdiction in regard to some thing or person." *Id.*; *see also* Collins English Disctionary (8th ed. 2019) (similar). Thus, to be an employer under USERRA, an entity must have power or authority regarding the servicemember's employment opportunities.

This understanding of control fits within the larger Act, satisfying the whole-text canon. *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017) (considering other usage of a word in the Act at issue); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–73 (2012) (discussing the presumption of consistent usage). In particular, 38 U.S.C § 4319 concerns when employment and reemployment rights arise under USERRA in connection with entities in foreign jurisdictions. Subsection (c) states, in material part, that "the determination of whether an employer controls an entity shall be based upon the interrelations of operations, common management, centralized control of labor relations, and common ownership or financial control of the employer and the entity." 38 U.S.C. § 4319(c). So the plain meaning of "control" in the text of Section 4303 is consistent with that term's operation in Section 4319(c).

Other federal courts implicitly concur and have recognized that determining whether an entity exercises the requisite degree of control over a servicemember's employment opportunities is a fact-intensive investigation. *E.g.*, *Estes v. Merit Sys. Prot. Bd.*, 658 F. App'x 1029, 1031–32 (Fed. Cir. 2016); *White*, 987 F.3d at 627. Several courts have found that the most persuasive sign of control is authority to hire, fire, and promote the servicemember. *See Garcia v. Spring Indep. Sch. Dist.*, No.

4:19-CV-1847, 2020 WL 8299810, at *1 (S.D. Tex. Mar. 17, 2020); *see also Estes*, 658 F. App'x at 1031–32 (accepting that an entity with sufficient coercive power over the termination decision may be a co-employer); *O'Connell v. Town of Bedford*, No. 21 CIV. 170 (NSR), 2022 WL 4134466, at *8 (S.D.N.Y. Sept. 12, 2022) (input over hiring and firing is sufficient to be an employer); *Croft v. Vill. of Newark*, 35 F. Supp. 3d 359, 368 (W.D.N.Y. 2014) (collecting federal cases from Ohio, Virginia, and North Carolina); *Jones v. Wolf Camera, Inc.*, Civ.A. No. 3:96-CV-2578-D, 1997 WL 22678, at *2 (N.D. Tex. Jan. 10, 1997) (holding that when two individuals "were delegated absolute authority with respect to hiring and firing employees" they meet USERRA's definition of "employer"). But where such power is lacking, an entity does not have the requisite degree of "control" to be an employer. *See Mace v. Willis*, 259 F. Supp. 3d 1007, 1023 (D.S.D. 2017), *aff'd*, 897 F.3d 926 (8th Cir. 2018) (holding that an individual without power to fire could not be an "employer").

Another indicium of control is a high degree of supervision of an employee's work. An entity that provides instruction, correction, or daily supervision of job performance is often an employer. *See Baker v. United Parcel Serv. Inc.*, 596 F. Supp. 3d 1251 (E.D. Wash. 2022) (a parent organization may be an "employer" under USERRA if the parent's acts are more than "purely formal" oversight); *Baldwin v. City of Greensboro*, No. 1:09CV742, 2010 WL 3211055, at *4 (M.D.N.C. Aug. 12, 2010), adopted in relevant part, 2010 WL 9904879 (M.D.N.C. Oct. 15, 2010) (holding that individuals involved in preparing performance evaluations and daily supervision were "employers" under USERRA); *Estes*, 658 F. App'x at 1032 (expressing mere "dissatisfaction with the performance of a contractor employee" does not create a co-employer relationship); *Dees v. Hyundai Motor Mfg. Alabama, LLC*, 605 F. Supp. 2d 1220, 1224 (M.D. Ala. 2009), *aff'd*, 368 F. App'x 49 (11th Cir. 2010) (explaining that a related company without involvement in the servicemember's personnel decisions is not an employer under USERRA).

Whether an entity determines the employee's salary or method of payment and benefits is also relevant. So, for example, processing paychecks and funding an entire salary suggests that an entity has sufficient "control" over the servicemember to be an employer. *United States v. Nevada*, 817 F. Supp. 2d 1230, 1238 (D. Nev. 2011) (holding the State, not just its agency, was an employer because the State processed the paychecks and funded the salary for the agency's employee);

*see also* 38 U.S.C. § 4303 (defining employers as entities that pay "salary or wages for work performed").

**B**

The facts here demonstrate that Kansas was not Gonzales's "employer" under USERRA. Kansas had no authority to hire or fire Gonzales, no authority to supervise her, and no input regarding her pay or benefits—including how much she was paid or the method by which she was paid. Kansas's annual grant to Finney County created Finney County's need to hire her, but that does not convert Kansas into an employer of its sub-grantee's employee.

**1**

Finney County alone possessed the authority to hire and fire Gonzales. In fact, Gonzales was an internal hire who had begun working for Finney County six years before the County hired her for the Specialist job with the Finney County Heath Department. Although a Kansas representative was present during the interview, the parties agree that Finney County hired Gonzales. The parties also agree that Finney County prepared the Specialist job description. And Goss—not anyone from Kansas—terminated Gonzales when Finney County lost its grant. The uncontroverted facts confirm that Kansas has no direct authority to fire any County-level Specialist, including Gonzales.

Nor did Kansas exercise sufficient indirect control over Gonzales's endeavors through its grant to Finney County. The grant funded Finney County's effort to meet specified disease intervention objectives, not a position. The grant was little more than an outcome-based renewable contract between Kansas and the County. *See Henke v. U.S. Dep't of Com.*, 83 F.3d 1445, 1450–51 (D.C. Cir. 1996) (explaining that a federal grant is a contract when the grant provides funds to a grantee in exchange for performance of certain conditions); *cf. Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 981–82 (7th Cir. 2012) (explaining that States are authorized to make sub-grants using federal disease intervention funds). The contractual relationship between Kansas and Finney County was not dependent on or for the benefit of Gonzales. Rather, the grant furthered Kansas's commitment to the federal government to satisfy the CDC's Prevention Award. In essence, Finney County was one vendor that Kansas used to meet its obligations under the federal grant. That

vendor began to underperform, so Kansas terminated its contractual relationship.

Finney County terminated Gonzales when its sub-grant was not renewed. But the facts confirm that Finney County did so in its capacity as Gonzales's employer, not at Kansas's direction. Finney County, not Kansas, supervised Gonzales. Gonzales interacted with Goss at least twice per week, but she had much less regular interaction with Kansas's staff. Goss, not Kansas, gave Gonzales her annual performance review. Likewise, Goss—not Kansas's staff—took disciplinary action to address workplace complaints that Finney County—not Kansas—received about Gonzales's unprofessional conduct and inappropriate sexual comments. Yes, representatives of Finney County and Kansas met to discuss Gonzales's performance as a Specialist. But Kansas continued to emphasize that Finney County was responsible for meeting the grant objectives (i.e., timely completion of interviews and data collection). Kansas's April 23 letter to Finney County underscored that Kansas was focused on Finney County's ability to satisfy the grant, not Gonzales's personal performance. *See Estes v. Merit Sys. Prot. Bd.*, 658 F. App'x 1029, 1032 (Fed. Cir. 2016) (concluding the Army was not an "employer" of a military contractor under USERRA even though the Army expressed "dissatisfaction with the performance of a contractor employee" and that led to the employee losing his job).

Finney County maintained its exclusive authority over Gonzales's salary, method of payment, and benefits, too. Gonzales's paychecks and benefits came from Finney County, not the State. Gonzales's rate of pay was set by Finney County, not the State. The parties dispute how much of the grant funded Gonzales's salary, but the precise amount matters not. Finney County set Gonzales's salary and benefits according to its own pay and benefits scale. The Kansas grant money did not cover her full salary, so Finney County paid the remainder. And the existence of a financial relationship between contracting parties is simply not dispositive as to whether the parties are both employers under USERRA. *See Silva v. Dep't of Homeland Sec.*, No. DC-4324-08-0776-I-1, 2009 WL 3047237, at *369 (M.S.P.B. Sept. 23, 2009) (explaining that an entity is not always the employer of a contractor's employees under USERRA simply because the entity provides a funding mechanism that supports salaries).

**2**

The United States says three additional facts suggest that Kansas exercised de facto supervision over Gonzales. These include that Kansas prescribed detailed protocols and training that affected how Gonzales performed her Specialist duties, that Kansas withheld Gonzales's patient reports from Finney County's Director, and that Kansas exercised substantive review over Gonzales's work, including filling out performance reviews for Gonzales in 2008 and 2009. Doc. 47 at 22–25; Doc. 53 at 23–25, n.10. But the particulars of these actions suggest that Kansas remained focused on ensuring that its sub-grantee, Finney County, was meeting the objectives of its contractual obligations under the sub-grant. Put simply, Kansas managed its grant, and Finney County managed its grant performance, including the employee it selected to do the work, Gonzales.[6] *Cf. Brug v. Nat'l Coal. for Homeless*, 45 F. Supp. 2d 33, 39 (D.D.C. 1999) (explaining in a Title VII context that a grantor's "active and integral role in overseeing the project" does not necessarily "transend[] the bounds of the grantor-grantee relationship as to become plaintiff's employer.").

That Kansas imposed detailed reporting requirements, protocols, and ongoing training on its sub-grantees does not suggest that it controlled Gonzales. *Contra* Doc. 47 at 23–25. Finney County accepted Kansas's conditions, and, in turn, tasked Gonzales with completing them. Yet the specific requirements and protocols appear to be generally applicable operating standards common to public health researchers and all of Kansas's sub-grantees, rather than specific directions to

---

[6] It is a familiar concept that grant monies, especially over time, can have a coercive impact on the priorities and independence of the entity that becomes accustomed to receiving the funding and the superstructure that inevitably springs from that funding. *See, e.g.*, *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78 (2012) (citing *Steward Machine Co. v. Davis*, 301 U.S. 548 (1937), and recognizing that federal monies may become coercive to state powers and priorities). But the fact of funding is not enough. Kansas does not "control" Gonzales simply because, at some level, her job can be traced to the grant money that flowed from the United States, to Kansas, and ultimately to Finney County.

14

Gonzales.[7] *Cf. Lepkowski v. Telatron Mktg. Grp., Inc.*, 766 F. Supp. 2d 572 (W.D. Pa. 2011) (explaining that detailed instructions and close monitoring are quality control mechanisms common in contracts, not indications an entity is a co-employer under the Fair Labor Standards Act).

Nor is control of Gonzales established by patient privacy protocols. *Contra* Doc. 47 at 24–25; Doc. 53 at 24–25. Kansas's requirement that individual patient data be submitted directly to Kansas's Department of Health and Environment (and not to the sub-grantee) does not subject employees of sub-grantees to Kansas's "control." Kansas needed the precise patient data. But Finney County did not. Finney County could adequately supervise its employee's work product and its grant obligations through the Kansas-provided, monthly reports of de-identified data that Gonzales submitted. This attempt to balance patient privacy concerns against Finney County's obligations as an employer and sub-grantee did not establish Kansas's control over Gonazles.

The United States also points to 2008 and 2009 reviews of Gonzales that were unsigned but memorialized on Kansas's performance review forms. Doc. 53 at 24. The United States asserts that the use of these forms shows Kansas supervised Gonzales, even if Gonzales was never actually given the forms. Doc. 53 at n.10. But that's not the obvious conclusion here. Rather, the forms suggest a focus on the quantitative question of whether Gonzales performed Finney County's assigned interviews and tracing on time. That is consistent with the proposition that Kansas measured its grant deliverables and enforced the grant's terms on its grantee—not on its grantee's employee. As already noted, a government agency expressing its displeasure with a

---

[7] The parties contest the level of the CDC's involvement with the Finney County sub-grant, but agree that some of the detailed protocols mirror those required of Kansas by the CDC Award. The CDC is the nation's leading public health agency, so Kansas's repetition of detailed protocols and training from the CDC bolsters the conclusion that the detailed protocols and requirements are simply how public health research is done. And to the extent that Kansas passed its CDC grant obligations to Finney County, Kansas's actions were consistent with its vested financial obligation to carefully manage its grant to Finney County. *Cf. Siebert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1111–12 (N.D. Cal. 2014) (implying that the National Institute of Health does not transform itself into an employer of grantees simply because it provided a grant to a specific research organization).

15

sub-grantee's employee's performance of the grant obligations does not make the agency an employer under USERRA. *See Estes v. Merit Sys. Prot. Bd.*, 658 F. App'x 1029, 1031–32 (Fed. Cir. 2016).

### III

For the foregoing reasons, the United States' Motion for Partial Summary Judgment, Doc. 46, is DENIED and its motion to file a sur-reply, Doc. 59, is DENIED as moot. The State of Kansas's Motion for Summary Judgment, Doc. 48, is GRANTED.

It is so ordered.

Date: January 9, 2024                    s/ Toby Crouse
                                                                               Toby Crouse
                                                                               United States District Judge